UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DENNY F. ROSS,              )    Case No. 5:08CV2889

         )

         Petitioner,       )    JUDGE DONALD C. NUGENT

         )

     v.            )    Magistrate Judge George J. Limbert

         )

BENNIE KELLEY, Warden,     )

         )

         Respondent.     )    **Report and Recommendation**

         )    **of Magistrate Judge**

         )

         )

         )

Petitioner Denny F. Ross ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF Dkt. #1.  Petitioner seeks relief for alleged constitutional violations that occurred during his Summit County, Ohio Court of Common Pleas conviction for Attempted Murder, Rape, Intimidation of a Crime Victim, and two counts of Felonious Assault. ECF Dkt. #1.  On January 27, 2009, Respondent Bennie Kelley ("Respondent") filed an answer. ECF Dkt. #8.  February 13, 2009, Petitioner filed a traverse.  ECF Dkt. #9.

The case was referred to the undersigned for a Report and Recommendation.  For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

**I.**    **SYNOPSIS OF THE FACTS**

The Ninth District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999).  As set forth by the Ninth District Court of Appeals, the facts are:

{¶ 3} Defendant's indictment stemmed from an incident that occurred in the early morning hours of June 16, 2004. The victim J.T ., testified that the following events

occurred. J.T. had a fight with her boyfriend, Jason Larue, and she decided to go out to a bar as a result. At the bar, she began a conversation with Defendant and two people who were with Defendant, Dannie Yeager and Karri Labut. The evening began with the foursome drinking together at the Station House 319 bar. The four then decided to leave to shoot pool at another bar. The four stayed at the second bar, Rumors, for a period of time and then returned to Station House 319 to purchase beer. Following the beer purchase, the four went to J.T.'s home. The four remained at J.T.'s home until approximately 2:00 a.m.

{¶ 4} At roughly 2:00 a.m., Mr. Yeager and Ms. Labut left J.T.'s residence. Defendant, however, remained at the home. J.T. testified that upon reentering the house from watching the others leave, Defendant attacked and raped her. As a result of the brutal attack, J.T. suffered multiple injuries including a laceration to her face and a broken jaw. At trial, J.T. testified that she believed that the laceration was caused by a knife during the attack. In addition, J.T. testified that she was choked while Defendant raped her. She went on to state that following the attack, Defendant took a picture of her children from her house, threatening to kill them if she called the police. Based upon these facts, Defendant was indicted and brought to trial.

ECF Dkt. #8, Ex. 12; *State v. Ross*, Case Nos. 22447, 22598, 2005 WL 2401611 at ¶¶ 3-4 (Ohio App. 9 Dist., Sept. 30, 2005), unreported.

## II.     PROCEDURAL HISTORY

### A.     State Trial Court

On June 28, 2004, the Summit County, Ohio prosecuting attorney filed an indictment charging Petitioner with: one count of Attempted Murder, in violation of R.C. 2903.02(A)/2903.02, a felony of the first degree; one count of Kidnapping, a violation of R.C. 2905.01(A)(3)/(4), a felony of the first degree; one count of Rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree; one count Felonious Assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree; one count of Intimidation of Crime Victim or Witness, in violation of R.C. 2921.04(B)(3), a felony of the third degree; one count of Petty Theft, in violation of R.C. 2913.02(A)(1), a misdemeanor of the first degree.  ECF Dkt. #8, Ex. 1.  On August 16, 2004, the prosecuting attorney filed a supplemental indictment charging Petitioner with  one count of Kidnapping, in violation of R.C. 2905.01(A)(2), a felony of the first degree; one count of Kidnapping, in violation of R.C. 2905.01(A)(4), a felony of the first degree; one count of Aggravated Robbery, in violation of R.C. 2911.01(A)(1), a felony of the first degree; and one count of Felonious Assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree.  ECF Dkt. #8, Ex. 2.

On October 25, 2004, the case proceeded to a jury trial.  ECF Dkt. #8, Ex. 5; Attach. #11-18 (trial transcript, hereinafter "Tr.").  On November 1, 2004, at the prosecuting attorney's request, the trial court dismissed two charges of Kidnapping and one count of  Petty Theft.  ECF Dkt. #8, Ex. 5.  On November 2, 2004, the jury convicted Petitioner of Attempted Murder in violation of R.C. § 2903.02(A), Rape in violation of R.C. § 2907.02(A)(2), Felonious Assault in violation of R.C. § 2903.11(A)(1), Felonious Assault in violation of R.C. § 2903.11(A)(2), Intimidation of Crime Victim or Witness in violation of R.C. § 2921.04(b), and Kidnapping in violation of R.C. § 2905.01(A)(4).  ECF Dkt. #8, Ex. 5.  The jury found Petitioner not guilty of Aggravated Robbery. ECF Dkt. #8, Ex. 5.

Petitioner filed a motion for judgment of acquittal and a motion for a new trial pursuant to Ohio Rules of Criminal Procedure 29(C) and 33, respectively.  ECF Dkt. #8, Ex. 6, 7.  On December 2, 2004, the trial judge denied petitioner's motions.  ECF Dkt. #8, Ex. 8.  He then sentenced Petitioner to 8 years of imprisonment for Attempted Murder, 8 years of imprisonment for Rape,  8 years of imprisonment for Felonious Assault on each of two counts, 8 years for Kidnapping, and 1 year of imprisonment for Intimidation of Crime Victim or Witness.  *Id*.  The trial judge merged Petitioner's sentence for Rape and Kidnapping for a total sentence of 8 years between the two counts.  *Id*.  He then imposed concurrent sentences for the two Felonious Assault convictions, with that combined term and all other convictions to be served consecutively for a total of 25 years of imprisonment.  *Id*.  The trial judge also adjudged Petitioner to be a sexual predator.  *Id*.  On March 8, 2005, the trial court resentenced Petitioner in order to inform him of his post release control obligations.  ECF Dkt. #8, Ex. 9.

**B.     Direct Appeal**

On March 29, 2005, Petitioner filed a notice of appeal from the Summit County Court of Common Pleas conviction.  ECF Dkt. #8, Ex. 10.  On May 31, 2005, Petitioner filed a brief in support of his direct appeal, raising the following assignments of error:

1.     All of the convictions returned against appellant must be reversed Because [sic] extensive pretrial publicity resulted in a violation of his impartial jury rights under the due process clause of the Fourteenth Amendment to the Federal Constitution and Article I, § 10 of the Ohio Constitution.

2.     The conviction of attempted murder returned against appellant must be vacated with prejudice because the evidence submitted at trial was constitutionally inadequate to sustain a finding of guilt. Petitioner is therefore entitled to relief under the due process clause of the Fourteenth Amendment to the Federal Constitution and Article I § 10 of the Ohio Constitution.

3.     The conviction of attempted murder must be reversed because the State of Ohio knowingly, deliberately and unlawfully deprived appellant of a meaningful opportunity to meet the State's case against him by concealing the specific allegation of strangulation made by the complaining witness until she testified on direct examination. Petitioner is therefore entitled to relief under the due process clause of the Fourteenth Amendment to the Federal Constitution and Article I § 10 of the Ohio Constitution.

4.     All of the convictions returned against appellant must be reversed because the failure of the State to disclose J.T's grand jury testimony and the refusal of the Trial Court to permit inspection of her grand jury testimony violated the requirements of the due process clause of the Fourteenth Amendment and Article I § 10 of the Ohio Constitution.

5.     Even if the refusal of the trial court to permit inspection of the grand jury materials did not rise to the level of a constitutional violation, the denial of access to grand jury testimony was an abuse of discretion requiring reversal.

6.     Each of the convictions returned against appellant must reversed [sic] because each is against the manifest weight of the evidence.

7.     Defendant's convictions and sentences for felonious assault violate R.C. § 2941.25 and the Double Jeopardy clauses of the Ohio and Federal Constitutions.

8.     The classification of appellant as a sexual predator must be vacated because the trial court failed to comply with the statutory requirements as mandated by the precedent of the Ohio Supreme Court. Furthermore, the trial court violated appellant's rights under the Ohio and Federal Constitutions by summarily adjudicating him as a sexual predator without an adequate evidentiary hearing.

9.     The classification of appellant as a sexual predator must be vacated because the trial court failed to comply with the statutory requirements as mandated by the precedent of the Ohio Supreme Court. Furthermore, the trial court violated appellant's right under the Ohio and federal constitutions by summarily adjudicating him as a sexual predator without an adequate evidentiary basis.

10.    Ohio's sexual predator statute violates *Blakely v. Washington*.

11.    The Ohio sexual predator statute is unconstitutionally vague as applied to defendant Ross.

12.    The trial court erred in resentencing defendant Ross when it lacked jurisdiction to do so.

ECF Dkt. #8, Ex. 13.

-4-

On September 30, 2005, the Ohio Court of Appeals for the Fifth District denied the appeal and affirmed the trial court's judgment with regard to the first eleven assignments of error, but vacated the trial court's resentencing order based upon the twelfth assignment of error.  ECF Dkt. #8, Ex. 17.

**C.      Supreme Court of Ohio**

On November 14, 2005, Petitioner filed a notice of appeal to the Supreme Court of Ohio. ECF Dkt. #8, Ex. 18.  Petitioner also filed a brief in support of jurisdiction, raising the following propositions of law:

I.      In a prosecution for attempted murder Article I Section 10 of the Ohio Constitution and the Fourteenth Amendment to the Federal Constitution require that the accused must be given notice of the alleged act constituting the purported attempt to kill. Ambushing the defense with a factual allegation that was deliberately omitted from the indictment and two separate bills of particulars constitutes a due process violation requiring reversal under the Federal Constitution and the Ohio Constitution.

II.     A defendant may not be convicted of attempted murder in the absence of proof beyond a reasonable doubt that the defendant actually attempted to murder someone.

III.    If the grand jury testimony of a key government witness could not have been consistent with both her trial testimony and her pretrial statements, the grand jury testimony necessarily constitutes exculpatory evidence which must be disclosed to the defense pursuant to the Federal Constitution and the Ohio Constitution.

IV.    A change of venue is constitutionally mandated where the state itself has conceded that unrelated allegations which have saturated the local community through media reports are too inflammatory and prejudicial for the courtroom.

V.      The Sixth and Fourteenth Amendments to the Federal Constitution forbid the imposition of a maximum sentence under Section 2929.14(C) where the required findings have not been proven beyond a reasonable doubt to a jury and have not been admitted to by the defendant.

VI.    The Sixth and Fourteenth Amendments to the Federal Constitution forbid the imposition of consecutive sentences under Section 2929.14(E) where the required findings have not been proven beyond a reasonable doubt to a jury and have not been admitted to by the defendant.

VII.   Multiplicitous felonious assault convictions violate R.C. Section 2941.25 and the Double Jeopardy Clauses of the Ohio and Federal Constitutions.

VIII.  Summarily adjudicating a defendant as a sexual predator is incompatible with the requirements of *State v. Eppinger* (2001), 91 Ohio St. 3d 158 and violates the Ohio Constitution and the Federal Constitution.

-5-

IX.    The Ohio sexual predator statute is unconstitutionally vague.

ECF Dkt. #8, Ex. 19.  On February 22, 2006, the Supreme Court of Ohio accepted the appeal on propositions of law V and VI and stayed proceedings pending resolutions of *State v. Foster*, 845 N.E.2d 470 (Ohio 2006).  ECF Dkt. #8, Ex. 21.  On March 3, 2006, the Supreme Court of Ohio reversed the Court of Appeals' judgment as to Propositions of Law Numbers V and VI and remanded the case for resentencing pursuant to *Foster*.  ECF Dkt. #8, Ex. 22.

**D.    Post-conviction Petition**

On August 24, 2005, Petitioner filed a request for an evidentiary hearing in the trial court. ECF Dkt. #8, Ex. 23.  Petitioner raised the following claims for relief:

1.    Use of perjured testimony in violation of *Napue v. Illinois* (1995), 360 U.S. 264.

2.    Withholding exculpatory evidence in violation of *Brady v. Maryland* (1963), 373 U.S. 83.

3.    Cumulative prejudice arising from petitioner's claims under *Brady* and *Napue*.

*Id*.  The state filed a motion to dismiss, which Petitioner opposed.  ECF Dkt. #8, Exs. 25, 26.  On November 30, 2005, the trial court dismissed the petition.  ECF Dkt. #8, Ex. 27.

On December 22, 2005, Petitioner filed a notice of appeal from the trial court's judgment denying his request for an evidentiary hearing.  ECF Dkt. #8, Ex. 28.  Petitioner filed a brief raising the following assignments of error:

1.    The court of common pleas erred in dismissing defendant Ross' amended petition for post conviction relief without disclosing the grand jury testimony of J.T. to defense counsel or conducting an in camera examination of J.T.'s grand jury testimony.

2.    The trial court erred in denying defendant Ross' request for an evidentiary hearing in support of his petition for post conviction relief.

3.    The trial court erred in holding that defendant Ross had not made a prima facie showing of a constitutional violation based on the use of perjured testimony by the prosecution.

4.    The trial court erred in applying the doctrine of res judicata to claims for relief which relied on evidence which was not contained in the trial record at the time of defendant Ross' direct appeal.

ECF Dkt. #8, Ex. 29.  On August 23, 2006, the Ohio Court of Appeals for the Ninth District denied

-6-

the appeal and affirmed the trial court's judgment.  ECF Dkt. #8, Ex. 32.

On October 10, 2006, Petitioner filed a notice of appeal to the Supreme Court of Ohio.  ECF

Dkt. #8, Ex. 33.   Petitioner filed a memorandum in support of jurisdiction raising the following

propositions of law:

1. Res judicata cannot operate to bar a post-conviction claim that favorable evidence has been suppressed where the State's own misconduct in suppressing the evidence prevented the claim from being fully litigated on direct review.

2. The Ohio and Federal Constitutions prohibit the prosecution from presenting testimony which it knows or should know is so misleading as to amount to falsity.

3. There is no "public records exception" to the constitutional obligation of the State to disclose favorable evidence.

4. An evidentiary hearing must be granted when a petition for post-conviction relief makes a prima facie showing that a conviction was obtained in violation of the constitutional rights of the accused.

ECF Dkt. # 8, Ex. 34.  On December 27, 2006, the Supreme Court of Ohio dismissed Petitioner's

appeal as not involving a substantial constitutional question.  ECF Dkt. #8, Ex. 35.

**E.      Resentencing**

On July 26, 2006, the trial court resentenced Petitioner and the trial judge imposed the same

sentence that he had previously imposed.  ECF Dkt. #8, Ex. 36.   On August 23, 2006, Petitioner

filed a notice of appeal from the trial court's resentencing judgment entry.  ECF Dkt. #8, Ex. 37.

Petitioner filed a brief raising the following assignments of error:

1. The court of common pleas violated appellant's right to trial by jury by sentencing appellant to a term of incarceration which exceeded the statutory maximum mandated by the Sixth and Fourteenth Amendments. The decision rendered by the Supreme Court of Ohio in *State v. Foster*, (2006) 109 Ohio St. 3d 1, which purports to authorize sentences in excess of the statutory maximum, is incompatible with the controlling precedent of the United States Supreme Court and must be rejected.

2. The court of common pleas violated appellant's right under the ex post facto clause of the Federal Constitution by sentencing appellant to a term incarceration which exceeded the maximum penalty available under the statutory framework at the time of the offense. The decision rendered by the Supreme Court of Ohio in *State v. Foster*, (2006) 109 Ohio St. 3d 1, which purports to authorize the sentence rendered against defendant Ross, is incompatible with the controlling precedent of the United States Supreme Court and must be rejected.

-7-

3.    The Court of Common Pleas violated appellant's rights under the Fourteenth Amendment to the Federal Constitution by sentencing appellant pursuant to the decision rendered by the Supreme Court of *Ohio in State v. Foster* (2006), 109 Ohio St. 3d 1, because the holding of Foster is invalid under *Rogers v. Tennessee* (2001), 532 U.S. 451.

4.    The rule of lenity required the imposition of non-maximum and concurrent sentences at resentencing, and the ruling of the Court of Common Pleas to the contrary must be reversed.

5.    The Court of Common Pleas erred by imposing a sexual predator classification without making a finding that defendant Ross poses a risk of recidivism.

6.    The Court of Common Pleas violated appellant's due process rights under the Ohio Constitution and the Federal Constitution by holding that the undisclosed grand jury testimony of the complainant did not have independent constitutional significance with regard to sentencing and punishment.

ECF Dkt. #8, Ex. 38.  On March 21, 2007, the Ohio Court of Appeals for the Ninth District denied Petitioner's appeal and affirmed the trial court's judgment.  ECF Dkt. #8, Ex. 41.

On May 2, 2007, Petitioner filed a notice of appeal to the Supreme Court of Ohio.  ECF Dkt. #42.  Petitioner filed a memorandum in support of jurisdiction, raising the following propositions of law:

1. When a criminal sentence has been rendered in violation of the right to trial by jury as protected by the Sixth and Fourteenth Amendments to the federal Constitution, the error cannot be remedied by retroactively eliminating the statutorily-mandated factual prerequisites to the imposition of an otherwise-unavailable penalty.

a. The limitations imposed on criminal sentencing by the jury trial guarantee of the Sixth and Fourteenth Amendments represent a fundamental reservation of power in the constitutional structure of American government.

b. Retroactively eliminating Apprendi-enforceable sentencing enhancements is fundamentally incompatible with the requirements imposed upon the criminal justice system by the Sixth and Fourteenth Amendments.

c. *Cunningham v. California* (2007), 127 S. Ct. 856, confirms that the remedial holding of Foster is unconstitutional.

2. If the text of a penal statute is modified while direct review of a criminal sentence is pending, the Ex Post Facto Clause of the Federal Constitution prohibits the imposition of any sentence exceeding the maximum penalty available under the statutory framework as it previously existed at the time of the underlying offense.

3. The due process clause of the Fourteenth Amendment prohibits the judiciary from retroactively expanding the range of penalties which may be lawfully imposed as punishment for a criminal conviction.

4. The rule of lenity requires the application of pre-*Foster* sentencing presumptions to cases which were not yet final when Foster was decided.

-8-

5. A sexual predator adjudication which is unaccompanied by any findings regarding the risk of recidivism is void as a matter of law.

6. If the grand jury testimony of a victim witness is necessarily inconsistent with other statements she has made, the testimony constitutes favorable evidence having independent constitutional significance with regard to punishment under *Brady v. Maryland* (1963), 373 U.S. 83.

ECF Dkt. #8, Ex. 43.  Petitioner also filed a motion to hold the first three propositions of law in abeyance pending disposition of *State v. Elmore*, Ohio No. 2007-0475.  ECF Dkt. #8, Ex. 44.  On October 17, 2007, the Supreme Court of Ohio denied leave to appeal as not involving a substantial constitutional question and denied Petitioner's motion as moot.  ECF Dkt. #8, Ex. 45.

**F.      28 U.S.C. § 2254 Petition**

On December 9, 2008, Petitioner filed the instant petition for a writ of habeas corpus.  ECF Dkt. #1.  Petitioner has raised the following grounds for relief:

> **GROUND ONE**:  The Ohio Court of Appeals acted contrary to the rule of *Rogers v. Tennessee*, 532 U.S. 451 (2001) in upholding petitioner's attempted murder conviction.
>
> **GROUND TWO:**  The Ninth Appellate District rendered an objectively unreasonable decision in refusing to extend the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83(1963) to the grand jury testimony of the prosecuting witness at petitioner's trial.
>
> **GROUND THREE:**  The Ohio Court of Appeals rendered an objectively unreasonable decision in denying petitioner's claims of knowing use of perjured testimony.
>
> **GROUND FOUR:**  The Ohio Court of Appeals acted contrary to clearly established federal law in holding that retroactively eliminating the statutory elements of a criminal offense did not violate petitioner's rights under the United States Constitution.
>
> **GROUND FIVE:**  The decision of the Ohio Court of Appeals in petitioner's case, and the decision of the Ohio Supreme Court in Foster upon which the Court of Appeals relied, constituted an objectively unreasonable application of *United States v. Booker*, 543 U.S. 220 (2005).
>
> **GROUND SIX:**  The Ohio Court of Appeals applied *Rogers v. Tennessee*, 532 U.S. 451 (2001) in an objectively unreasonable manner.

ECF Dkt. #1.  On January 27, 2009, Respondent filed a return of writ.  ECF Dkt. #8, Ex. 8.  On

-9-

February 13, 2009, Petitioner filed a traverse.  ECF Dkt. #8, Ex. 9.

**III.     PROCEDURAL BARRIERS TO REVIEW**

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

Further, the Supreme Court has held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

**A.     Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. § 2244(d)(1).  The AEDPA statute of limitations is not currently at issue in this case.

**B.     Procedural Default**

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds."  *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir.

-10-

1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted.  *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

> (1)  whether the petitioner failed to comply with an applicable state procedural rule;
>
> (2)  whether the state courts actually enforced the state procedural sanction;
>
> (3)  whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and
>
> (4)  if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve  to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006).  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d

-11-

711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004). The above standards apply to the Court's review of Petitioner's claims.

## IV. STANDARD OF REVIEW

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 on February 26, 2007, well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

-12-

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus.  The AEDPA provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>   (1)  resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.*  Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

> A.  Decisions of lower federal courts may not be considered.
>
> B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.

-13-

    C.      The state court decision may be overturned only if:

        1.      It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

        2.      the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

        3.      'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

        4.      the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

    D.      Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

    E.      Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

    (e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## V.      ANALYSIS

### A.      Ground One: Alleged *Rogers* Violation

Petitioner first contends that his attempted murder conviction was not supported by sufficient evidence.  An allegation that the verdict was entered upon insufficient evidence states a claim under the due process clause of the Fourteenth Amendment to the United States Constitution.  *Jackson v. Virginia*, 443 U.S. 307, *reh'g denied*, 444 U.S. 890 (1979), *and In re Winship*, 397 U.S. 358 (1970).  On habeas review, the District Court cannot weigh the credibility of the witnesses.  *Walker v. Engle*, 703 F.2d 959, 969.  Nor is the District Court permitted to overturn a conviction merely because it would have acquitted had it acted as the finder of fact.  *Brown v. Davi*s, 752 F.2d 1142, 1147 (6th Cir. 1985), *and Walker,* 703 F.2d at 969.  In order to establish an insufficiency of the evidence claim, the relevant inquiry is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Scott v. Mitchell,* 209 F.3d 854, 885 (6th Cir. 2000), *quoting Jackson,* 443 U.S. at 319.  "This requires successful challengers to meet a very high threshold, even with respect to newly-discovered evidence."  *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006).  The inquiry is not whether the jury made the *correct* determination of guilt or innocence, but whether it made a *rational* decision to acquit or convict.  *Williams v. Haviland,* No. 1:05CV1014, 2006 WL 456470, *3 (N.D.Ohio Feb.

-15-

24, 2006), citing *Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).  A court should interfere with a jury verdict only to the extent necessary to guarantee the fundamental protections of due process of law.  *Scott,* 209 F.3d at 885 *quoting Jackson,* 443 U.S. at 319.

In the case at bar, Petitioner contends that there was "absolutely no evidence that Petitioner had actually attempted to kill [the victim]."  ECF Dkt. #1 at 14.  In advancing this argument, Petitioner offers the following summary of pertinent facts:

> At trial, J.T. alleged that Petitioner had asked to use the restroom as he was leaving the residence; J.T. claimed that when she went upstairs to check on Petitioner, he attacked her and knocked her down the stairs. (TR 115-26). J.T. asserted that she was raped and beaten downstairs, and that Petitioner threatened to kill her and her children if she fought him. (TR 115-26). J.T. stated that she was punched in the head and choked while the rape was occurring, and that after the attack Petitioner took a picture of her children and left the residence. (TR 115-26).

ECF Dkt. #1 at 14.  Petitioner contends that the Ohio appellate court improperly held that the jury may have considered conditional intent.  *Id.*  That is, "that the jury could have inferred beyond a reasonable doubt that: 1. Petitioner attacked J.T., intending to rape her; 2. when J.T. struggled, he decided to choke her and 'intended to kill J.T. if he could not successfully rape her;' but, 3. changed his mind and decided that killing J.T. would not be necessary because she had been subdued by the choking."  *Id.* citing ECF Dkt. #1 at 14 ¶¶ 19-21.  Petitioner contends that Ohio law did not recognize the doctrine of conditional intent at the time of the offense, and the appellate court's application of the principle violates the rule of law articulated by the United States Supreme Court in *Rogers v. Tennessee*, 532 U.S. 451 (2001).  ECF Dkt. #1 at 15 citing *State v Kinnemore*, 295 N.E.2d 680, 682-83 (Ohio App. 2d Dist. 1972).  In *Rogers*, the United States Supreme Court held that "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' [the construction] must not be given retroactive effect."  *Rogers*, 532 U.S. at 457.

Even assuming, arrguendo the court in the  case at bar relied upon the possibility of conditional intent, the *Kinnemore* case upon which Petitioner's argument relies fails to establish that conditional intent was not recognized in Ohio at the time of  Petitioner's conviction because

-16-

*Kinnemore*, a single case from the Second District Court of Appeals, is not binding precedent on the

Ninth District Court of Appeals. The *Kinnemore* court *did* state that conditional intent was not a

valid legal theory in Ohio at the time:

> The third assignment of error challenges the weight and sufficiency of the evidence presented by the state to sustain the charge of 'assault with intent to kill,' and this alleged error brings into focus the difficult question in the case.
>
> The state submitted overwhelming evidence that Kinnemore assaulted Sharon Frazier in an attempt to effect an escape, but the evidence of an intent to kill at the time of the assault is dependent upon considerable speculation. The assault took place within a few feet of the security officer, Margaret Mason, and the four male employees. Each of these witnesses testified that the appellant twice said that 'if you guys don't let me go, I'm going to kill her.'
>
> Although the assault was complete at that point, the exclamation tends to show that its objective was escape-not murder. The threat was conditional, where as an assault coupled with a present intent to kill necessarily involves continuous, sequential, and uninterrupted conduct. The state was required to prove that Kinnemore intended to kill Miss Franzier at the time of the assault, but the evidence upon this issue, which consists entirely of the exclamation of the defendant at the time of the assault, is not sufficient to sustain an essential element of the crime beyond a reasonable doubt; hence, the third assignment of error is well made.

*Kinnemore*, 295 N.E.2d at 682-83. And the *Kinnemore* case appears to be factually analogous to the

case at bar because the defendant in *Kinnemore* stated that he would only kill the victim if he was

unable to escape and J.T. testified in the case at bar that Petitioner stated that he would kill her if he

was unable to rape her (Tr. at 115-26).

However, the *Kinnemore* case does not necessarily embody Ohio law. "Under the rule of

stare decisis [a court of appeals is] **bound by the decisions of the Supreme Court [of Ohio]**."

*Miller v. Chrysler Corp.*, 183 N.E.2d 421 (Ohio App. 8th Dist. 1962) (emphasis added); *see also*

*State v. Yonkings*, Case Nos. 94CA005807, 94CA005825, 1994 WL 721850 at *2 (Ohio App. 9 Dist.

Dec. 30, 1994), unreported ("Nonetheless, under the doctrine of stare decisis, this court is compelled

to follow the decision of the **Supreme Court of Ohio** as laid down in *White*.") (emphasis added).

 "As the United States Supreme Court has observed, faced with controlling authority **by a superior**

**court** and another line of decisions, **a court of appeals has only one course-to follow the authority**

**of the court to which it is inferior**, 'leaving to [the higher court] the prerogative of overruling its

-17-

own decisions.' " *Johnson v. Microsoft Corp.*, 805 N.E.2d 179, 181-82 (Ohio App. 1st Dist. 2004).

(internal citations omitted.) (emphasis added).  The Supreme Court of Ohio stated that:

> While the principle of stare decisis is necessary to an orderly and predictable system of law, the principle is not to be substituted for analyzing each case as it is presented. To follow a precedent is not to reach the same result; rather, it is to adopt the reasoning **of the precedential case**. To reject a precedent is not merely to reach a different result, but to find that the reasoning and principles advanced in favor of that precedent are no longer persuasive.

*Shearer v. Shearer*, 480 N.E.2d 390-90 (Ohio 1985) (emphasis added).  It follows that two courts of the same authority can differ on their interpretation of the law and one is not bound by the other.  *See e.g. Jones v. Walton*, Case No. CA87-09-117, 1987 WL 20377 at *3 (Ohio App. 12th Dist. Nov. 23 1987), unreported (holding that one common pleas judge was not bound by the ruling of another common pleas judge.  In fact, this Court can take notice that the various United States Court of Appeals interpret federal law differently, often requiring the United States Supreme Court to resolve the issue.  *See e.g. U.S. v. Quinn*, --- F.3d ----, 2009 WL 2391856 at *4 (6th 2009), slip op. ("We thus note that a circuit split exists on the question of whether a Guidelines range is mandatory in a sentence-modification proceeding under § 3582(c)(2) . . ."); *Engstrom v. Mayfield*, 195 Fed.Appx. 444, 448 (6th Cir. 2006) ("The Supreme Court has recently weighed in on this precise issue in order to resolve a circuit split. . .").  There is no reason to believe that an Ohio Court of Appeals would be bound by another District's interpretation of state law.  Petitioner has failed to establish that the Ninth District decision in this case was bound by the Second District's decision in *Kinnemore*.

Petitioner has not pointed to any precedent from the Supreme Court of Ohio or the Ninth District Court of Appeals that would have been binding in his case.  Further, he points to only one case rather than a collection of cases to establish that the *Kinnemore* court's analysis was broadly accepted in Ohio courts.  Petitioner states that "the United States Supreme Court itself has recognized that Ohio is in the minority of jurisdictions where conditional intent is not a valid legal theory" by pointing to the *Kinnemore* case.  ECF Dkt. #1 at 15.  Although it is true that the United States Supreme Court made mention of the *Kinnemore* case, the Court did *not* broadly classify the entire state of Ohio as not recognizing conditional intent, but rather stated that *one* Ohio court had rejected

-18-

conditional intent:

> The court held that the jury had been properly instructed that the "specific intent to kill" could be found even though that intent was "coupled with a condition" that the defendant would not fire if the victim complied with his demand. [FN8] **That holding has been repeatedly cited with approval by other courts [FN9]and by scholars.**

\*        \*        \*

> FN9.  *See People v. Vandelinder*, 192 Mich.App. 447, 451, 481 N.W.2d 787, 789 (1992) (endorsing holding of Connors ); *Eby v. State*, 154 Ind.App. 509, 517, 290 N.E.2d 89, 95 (1972) (same); *Beall v. State*, 203 Md. 380, 386, 101 A.2d 233, 236 (1953) (same); *Price v. State*, 168 Tenn. 378, 381, 79 S.W.2d 283, 284 (1935) (same). *But see State v. Irwin*, 55 N.C.App. 305, 285 S.E.2d 345 (1982) (reaching opposite conclusion)**;** ***State v. Kinnemore*, 34 Ohio App.2d 39, 295 N.E.2d 680 (1972) (same).**

*Holloway v. U.S.*,  526 U.S. 1, n. 9 (1999) (emphasis added).  The United States Supreme Court simply stated that the *Kinnemore* court had held that specific intent to kill, coupled with a condition, was not sufficient to support a conviction for attempted murder.  The Court did not state that Ohio as a whole was "in the minority of jurisdictions where conditional intent is not a valid legal theory."  Therefore, the Court should reject Petitioner's contention that a single Second District Court of Appeals case, *Kinnemore*, constituted the embodiment of Ohio law on the issue at the time of Petitioner's conviction.

In addition to the weak precedential value of the *Kinnemore* case, Petitioner's argument should fail because it appears that the Ohio Court of Appeals did not wholly rely on conditional intent in his particular case.  The undersigned first notes that Petitioner's argument relies on the misleading assertion of fact that "J.T. stated that she was punched in the head and choked while the rape was occurring. . ."  ECF Dkt. #1 at 14.  Upon review of the record, the undersigned notes that J.T.'s testimony could support a jury finding that Petitioner choked her *before* raping her.  This distinction is important because, as the appellate court noted, a defendant's intent must often be gleaned from circumstantial evidence.  If Petitioner choked the victim prior to raping her, the jury could have fairly concluded that his motive was to kill because the victim testified that Petitioner threatened to kill her if she resisted his efforts to rape her and she further testified that she did resist.

-19-

Tr. at 122, l. 16-20;  123, l. 8-18.

Contrary to Petitioner's assertion that the appellate court relied upon conditional intent, the appellate court relied upon specific intent by holding:

{¶ 17} To facilitate analysis, we will first address Defendant's attempted murder conviction and then his remaining convictions.

{¶ 18} Attempt is defined by R.C. 2923.02(A) as follows:

"No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

R.C. 2903.02 provides that "No person shall purposely cause the death of another [.]" With respect to his attempted murder conviction, Defendant urges that the State failed to demonstrate that he had the intent required under the statute to be convicted. This Court disagrees.

{¶ 19} In order to convict a defendant for attempted murder, the State is required to prove that the defendant has a specific intent to kill at the time of the offense. *State v. Widner* (1982), 69 Ohio St.2d 267, 268-269, 431 N.E.2d 1025. Because a defendant's mental state is difficult to demonstrate with direct proof, it may be "inferred from the surrounding circumstances." *State v. Logan* (1979), 60 Ohio St.2d 126, 131, 397 N.E.2d 1345. In this matter, Defendant urges that since the he could have killed the victim, but chose not to, he clearly never intended to kill her. Defendant further asserts that his subsequent threat to kill the victim demonstrates that he never intended to kill her. We find that both of Defendant's contentions lack merit.

**{¶ 20} J.T. testified that Defendant choked her and that she believed that she lost consciousness on several occasions as a result of the choking and the severe beating she received. We find that from the facts that the jury could reasonably infer that J.T.'s lapses into unconsciousness eliminated Defendant's desire to kill her. Prior to the assault, Defendant warned J.T. that he would kill her if she fought back. Once the victim began to lose consciousness, Defendant could successfully complete the crime that he desired, rape, without killing J.T.**

{¶ 21} Further, Defendant has offered no authority for his position that he could not have changed his mind during the course of the attack, unless the victim had successfully fought him. Once Defendant realized that he had successfully beaten J.T. into submission, he no longer had to follow through with his prior threat. However, that does not mean that Defendant did not take a substantial step in a course of conduct planned to culminate in murder. *See State v. Group*, 98 Ohio St.3d 248, 781 N.E.2d 980, 2002-Ohio-7247, at ¶ 95. Defendant choked J.T. until she was unconscious. That fact alone presents substantial evidence from which a jury could reasonably infer that Defendant intended to kill J.T. if he could not successfully rape her.

-20-

ECF Dkt. #8, Ex. 17 at ¶¶17-21 (emphasis added).  From paragraph 20, above, it appears that the Court of Appeals was not referring to conditional intent.  Rather the court was suggesting that the jury could have found that Petitioner was actually engaging in the act of murder but desisted once the victim lost consciousness and he saw an opportunity to commit the rape that he originally intended to commit.  In other words, he was choking her for the purpose of murder rather than for the purpose of rape.  While this theory is closely related to the conditional intent analysis upon which Petitioner relies, a crucial difference exists.  If Petitioner was actually engaged in the act of attempting to murder the victim while choking her and he changed his mind after she lost consciousness, then he did exhibit specific intent, even if that intent lasted for a very brief period.  In that circumstance there is not a question of conditional intent.

The closely related theory that Petitioner advances is that he would have allegedly only committed the murder if he could not have committed the rape.  The undersigned notes that the appellate court stated that "the jury could reasonably infer that J.T.'s lapses into unconsciousness *eliminated Defendant's desire to kill her.*" *Id.* at ¶ 20 (emphasis added).  Since the court stated that the lapses in consciousness eliminated Petitioner's intent to kill, the court necessarily determined that the jury could have found at some point Petitioner had the specific intent to kill.  It is therefore clear that the appellate court found that there was sufficient evidence upon which the jury could determine that Petitioner was attempting to murder the victim with specific intent to kill at the time of the offense, but the change in circumstances (*i.e.*, her unconsciousness) eliminated his desire to complete the murder.  As discussed above, J.T.'s testimony that Petitioner threatened to kill her if she resisted, that she did resist, and that he began to choke her, provides the evidence to support the factual conclusion of specific intent to murder, even if that intent was later eliminated.

Although this case is somewhat similar to *Kinnemore* , a distinction exists in that Petitioner threatened to kill the victim if he could not perform the rape, when she resisted he began to choke her to the point that she lost consciousness, and at some point he raped her.  In *Kinnemore*, a man had stolen merchandise from a department store and was detained in an upstairs office with a security officer, four male employees, and a female employee.  *Kinnemore*, 295 N.E.2d 681-82.  Once he was

-21-

cornered, he threatened to kill the female employee if he was not allowed to escape. *Id*. at 682. The *Kinnemore* court stated that the state was required to prove an intent to kill, but the defendant's exclamation at the time of the assault was insufficient to sustain an essential element of the crime of attempted murder. *Id*. at 683. Unlike *Kinnemore*, evidence was presented in the instant case that Petitioner threatened to kill J.T. and then actually began to choke her. Therefore, the state did not wholly rely on Petitioner's exclamation like the state did in *Kinnemore*.

Further, the fact that he was able to perform the rape does not mean that he never, for a moment, manifested an intent to commit the murder. He may have manifested the intent to commit the murder, began to commit the murder by choking the victim, and desisted once she lost consciousness. As the appellate court observed, it is difficult to demonstrate with direct proof what a defendant's mental state is. In this case, it is clear that Petitioner's motives in choking the victim were aimed at either killing her or raping her. Perhaps even his intent changed during the course of events such that his intent included both an intent to choke her for the purpose of murder and for the purpose of rape. Sufficient evidence existed to support any of these conclusions because J.T. testified that Petitioner threatened to kill her if he could not commit the rape, she resisted, he choked her, and he ultimately committed the rape. Tr. at 122, l. 16-20; 123, l. 8-18.

Of note, there is little doubt that, had the victim immediately died rather than losing consciousness, sufficient evidence would be present to establish intent for murder. *State v. McBroom,* Case No. 84AP-1163, 1985 WL 10348 at *3 (Ohio App. 10th Dist. June 25, 1985), unreported ("If a person chokes another until she dies, there is ample evidence of intent to kill."). The fact that the victim lost consciousness and provided Petitioner an opportunity to retreat from the murder and commit the rape does not mean that he never had the specific unconditional intent to murder the victim, even if that intent was ephemeral. The fact that Petitioner ultimately committed the rape later cannot erase an earlier manifested intent to murder. Therefore, the fact that Petitioner ultimately raped J.T. did not foreclose the jury from concluding that, at the time he was choking the victim but before she lost consciousness, his intent was to murder her rather than to rape her. Accordingly, as the appellate court found, sufficient evidence supported a finding of a specific intent

-22-

to kill, and even if the court alluded to the possibility of the jury relying on conditional intent, that analysis does not vitiate the court's reliance on stand-alone specific intent. As such, there is no basis for relief on this habeas claim.

Petitioner contends that the court relied on conditional intent by stating that he " intended to kill J.T. if he could not successfully rape her." ECF Dkt. #1 at 14. Even under a conditional intent theory, Petitioner's claim fails because evidence was presented that he may have believed his condition to commit murder was satisfied at some point during the course of events. Obviously, once the condition underlying conditional intent is satisfied, then the intent will be manifested as specific intent. In this case, if Petitioner only intended to kill the victim if he could not commit the rape, and at some point during the commission of the crime he believed that he could not commit the rape, then the jury could have found that he formed the specific intent to kill. Therefore, even under a conditional intent theory, it is still possible for specific intent to manifest. It would be entirely proper for a jury to infer from the evidence presented that, even for a fleeting moment, Petitioner intended to kill the victim from his action of choking her because he stated that he would kill J.T. if he was unable to rape her and when she resisted, he began to choke her to the point that she became unconscious. Tr. at 122, l. 16-20; 123, l. 8-18.

Based on the foregoing, it is clear that the *Kinnemore* case was not controlling precedent, the Ohio appellate court did not rely wholly on conditional intent in this case, sufficient evidence existed to permit a jury to find that Petitioner manifested specific intent, and sufficient evidence existed to permit a jury to find that the condition of Petitioner's intent to kill was satisfied and he developed the specific intent to kill. Accordingly, the undersigned recommends that the Court dismiss Ground One in its entirety with prejudice.

### B.    Ground Two: Alleged *Brady* Violation

Next, Petitioner contends that the State withheld the victim's grand jury testimony, which amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). ECF Dkt. #1 at 16. Before reviewing Petitioner's claims, it is necessary to outline the pertinent law under *Brady*.

In *Brady*, the United States Supreme Court held that "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  In later cases, the Court eliminated the requirement for a defendant to request favorable information and stated that the constitutional duty to disclose is "triggered by the potential impact of favorable but undisclosed evidence. . ." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667 (1985);  *United States v. Agurs*, 427 U.S. 97 (1976).

To prevail on a *Brady* claim in habeas, a petitioner must demonstrate that the State withheld evidence from the defense at trial that was both material and favorable.  *Kyles,* 514 U.S. at 432; *Brady*, 373 U.S. at 87.

Evidence is considered to be "exculpatory" for *Brady* purposes if it is favorable to the accused.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).  Exculpatory evidence includes impeachment material.  *Bagley*, 473 U.S. at 676.  In fact, inculpatory evidence may be considered *Brady* material if it may be used to impeach a witness.  *Strickler v. Greene*, 527 U.S. 263, 21 (1999).

Evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433 (internal quotation omitted).  "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . ." *Id*. at 434.

The *Kyles* Court reaffirmed an earlier holding from *Bagley* outlining four aspects of materiality.  With regard to the first aspect, the *Kyles* Court stated that:

> The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at 435.  The second aspect of materiality is that it is not a sufficiency of evidence test

-24-

and a defendant need not demonstrate that after discounting inculpatory evidence in light of the undisclosed evidence, there would have been enough left to convict. *Id.* "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

Third, the *Kyles* Court noted that there is no need for harmless error review once a court has found a constitutional error because a *Bagley* error could not be treated as harmless where there is a reasonable probability that the result of proceeding would have been different if the withheld evidence had been disclosed. *Kyles,* 514 U.S. at 435.

Fourth, the *Kyles* Court stressed that, in assessing materiality, suppressed evidence must be considered collectively, not item by item. *Kyles,* 514 U.S. at 436. The definition of *Bagley* materiality in terms of cumulative effect provides the prosecution with some deference while imposing a corresponding burden:

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady,* 373 U.S., at 87, 83 S.Ct., at 1196-1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles,* 514 U.S. at 437-38.

Further, a court is not to consider the motives of the prosecution in withholding the suppressed evidence. *Brady*, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*.") (emphasis added).

In the instant case, Petitioner asserts that the victim's statements during the investigation

-25-

repeatedly changed.  ECF Dkt. #1 at 17.  Petitioner offers the following summary of alleged

inconsistencies:

1. She had been at Burger King and at a Mexican restaurant with a woman and two men. The three individuals had followed her home, and she was raped in her driveway by one of the men, who said his name was Joseph, after the other two people had left. (TR 384-86, 392-93).

2. She had been raped in her home by an individual who had been with another man and a woman. He said that he would leave once the other two had backed their vehicle out of the driveway; instead, he attacked and raped her downstairs after the other two left. (TR 422-26).

3. She went out for the evening and met three people whom she had not previously known. When she tried to go home, they followed her and came inside even though she had not invited them. After one of the men and the woman had left, the other man held a knife to her throat and ordered her to take him upstairs; he then raped and beat her. (TR 440-42; 454-57; 502).

4. She had been raped by an individual who was at her home with another man and another woman. She had walked the three individuals outside after telling them that she wished to go to bed. One of the men offered to walk her back inside, but she declined; the man then raped and assaulted her after pulling her to the ground. (TR 517).

5. She had been raped by a man who had been at her home with an acquaintance named Daniel Yeager and Yeager's girlfriend. She had invited the three to her home because she knew who Yeager was and she trusted him. The man with Yeager and Labut asked to use J.T.'s bathroom prior to leaving, and then attacked her in the upstairs hallway with a knife prior to raping her downstairs. (TR 117-20; 176).

ECF Dkt. #1 at 17-18.  Petitioner contends that these inconsistencies make clear that J.T. offered

testimony to the grand jury that was inconsistent with at least some of her previous statements.  ECF

Dkt. #1, Ex. 18.  Petitioner's claim lacks merit because, even assuming that the grand jury transcripts

contained exculpatory information that should have been disclosed pursuant to *Brady*, Petitioner has

failed to demonstrate materiality.  Petitioner has pointed to what he considered to be "numerous

inconsistent statements," (ECF DKt. #1 at 20) which he collected from the trial record.  As stated

above, the standard for assessing materiality is "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."

Further, the Court must consider what "competent counsel" could have accomplished with the

-26-

evidence.  *See Kyles*, 514 U.S. at 441 ("In this case, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.")  Since counsel pointed to "numerous inconsistencies" in the trial record, it is difficult to conclude that a reasonable probability exists that competent counsel could have effected a different result by pointing to one more inconsistency.  The fact that the grand jury testimony was sworn should not have any effect since Petitioner contends that the inconsistencies exist with the victim's trial testimony, which was also sworn.  *See* Tr. at 117-20; 176.

Further, Petitioner's argument that the grand jury transcripts necessarily contain inconsistencies lacks merit because, as the Ohio Court of Appeals explained in this case, "J.T. openly admitted that she had not been honest with each of the officers during the investigation.  Further, she explained the rationale behind her dishonesty. There is no indication from the record that her grand jury testimony in any way deviated from the testimony elicited by the State."  *Ross*, 2005 WL 2401611 at ¶46.  The Court should conclude that the grand jury testimony is not material evidence for *Brady* purposes because there is no likelihood that it would have affected the result of the trial.

Lastly, the undersigned notes that Petitioner contends that the grand jury transcripts "should have been released to Petitioner so that he could make an affirmative (rather than implicative) showing that *Brady* had been violated*."* ECF Dkt. #1 at 18.  The appellate court noted that Petitioner failed to state a proper basis for disclosing the grand jury transcripts:

> {¶ 41} Our review of the record indicates that Defendant filed his motion for grand jury transcripts on August 17, 2004, and captioned the motion "Defendant's Motion for a Pretrial Copy of the Transcript of the Grand Jury Proceedings." (Emphasis added.) Defendant did not limit this motion in any manner. That is, he requested the entire transcript of the grand jury proceedings, arguing that the witnesses' testimony "at the Grand Jury may be inconsistent with the other statements that they have made; their testimony at the Grand Jury may contain exculpatory or impeachment information."
>
> {¶ 42} Based upon the Defendant's motion, the trial court was not placed on notice of any inconsistencies, as Defendant did not identify any of those inconsistencies. Recognizing the proper burden, the trial court inquired of Defendant as follows: "Is there any individualized need for that information?" Defendant's counsel responded that he desired a witness list first because he didn't "know what was said to the grand jury[.]" As Defendant attempted to use his motion as a discovery tool solely for searching for hypothetical impeachment information, we cannot say that the trial court

-27-

abused its discretion in denying his motion. *Laskey*, 21 Ohio St.2d at 191, 257 N.E.2d 65. Simply stated, Defendant's "bald assertion * * * that he needed to examine the testimony of an adverse witness for inconsistencies failed to set forth a particularized need." *State v. Mack* (1995), 73 Ohio St.3d 502, 508, 653 N.E.2d 329.

{¶ 43} In addition, this Court cannot say that Defendant properly made an in-trial request for the transcripts following questioning which revealed inconsistencies. Rather, at the close of the State's case, Defendant's counsel stated: "Can I just renew the motions I filed, Your Honor? All the motions that I filed prior to trial[.]"

{¶ 44} The trial court had previously denied Defendant's motion for transcripts from the grand jury proceedings. We cannot find that such a broad statement from counsel renewed with specificity every pretrial motion. Further, even assuming arguendo that Defendant did renew his pretrial motion, that motion still fails to state with any specificity why Defendant is entitled to the grand jury transcripts.

*Ross*, 2005 WL 2401611 at ¶¶ 41-43. Although the state must produce *Brady* material even without a defendant's request, as discussed above, Petitioner's failure to properly move the trial court for the grand jury transcripts is the cause for his failure to make an affirmative *Brady* showing. Petitioner's inability to demonstrate a *Brady* violation is not the result of a state-created impediment. Accordingly, the Court should reject Petitioner's contention that he is unable to make an affirmative showing of a *Brady* violation due to the state court's failure to release the grand jury transcripts.

For the foregoing reasons, the undersigned recommends that the Court dismiss Ground Two in its entirety with prejudice.

### C.     Ground Three: Alleged Use of Perjured Testimony

In Ground Three, Petitioner contends that the Ohio Court of Appeals rendered an objectively unreasonable decision in denying Petitioner's claim of knowing use of perjured testimony. ECF Dkt. #1 at 20.  Petitioner's argument relies on this synopsis of the facts:

The evidence at trial established that J.T. had been a victim of domestic violence and that her husband had subjected her to physical and emotional abuse. (TR 57-61). The prosecution also elicited testimony regarding the criminal prosecution and conviction of J.T.'s husband, including the fact that she had committed perjury at her husband's trial in unsuccessful attempt to prevent his conviction. (TR 57-61). In addition, the State established that J.T.'s husband had been released from prison the month before Defendant Ross' trial. (TR 61-63). The prosecutor also elicited the following testimony from J.T.:

-28-

> Q: Okay. And do you recall testifying--or let me back up. Did you obtain a civil protection order against your husband at one point?
>
> A: Yes.
>
> Q: And did you revoke that protection order?
>
> A: Yes.
>
> (TR 60).

ECF Dkt. #1 at 20-21. Petitioner contends that the foregoing testimony was literally true, but it was so misleading as to amount to a falsity. *Id*. Petitioner reasons that J.T. had obtained a new civil protection order against her husband only two days before testifying. *Id*. Petitioner's entire argument relies on the misleading nature of the statements rather than their falsity. As such, his argument must fail because Sixth Circuit precedent clearly provided that knowing use of a misleading statement does not amount to a constitutional violation.

To establish a due process violation based upon the introduction of false testimony, Petitioner must demonstrate that (1) J.T's testimony was false, (2) the prosecution knew it was false, and (3) it was material. *Napue v. Illinois*, 360 U.S. 264, 269 (1959), *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). In establishing falsity, Petitioner "**must show that the statement in question was 'indisputably false,' rather than merely misleading**." *Byrd*, 209 F.3d at 517-18 quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989) (emphasis added); *see also Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009); *Thorne v. Moore*, Case No. 5:06-CV-872, 2009 WL 2421741 at *8 (N.D. Ohio July 31, 2009), slip op. Petitioner has not pointed the Court to any binding precedent for the proposition that a misleading statement can form the basis for a constitutional violation. Rather, Petitioner points to authority from other jurisdictions and ignores precedent set forth in *Lochmondy* and its progeny.

Even if a misleading statement could form the basis of a constitutional violation, Petitioner has provided no evidence to support his claim that J.T. had obtained a new civil protection order

-29-

against her husband only two days before testifying.  Therefore, he would fail to meet his burden of establishing a constitutional violation even under a more liberal standard.

For the foregoing reasons, the undersigned recommends that the Court dismiss Ground Three in its entirety with prejudice.

### D.    Grounds Four through Seven: Alleged Sentencing Violations

Lastly, Petitioner alleges several violations stemming from the trial court's sentencing in his case.  ECF Dkt. #1 at 24-40.  Petitioner alleges in Ground Four that the Ohio Court of appeals acted contrary to clearly established federal law in holding that retroactively eliminated elements of a criminal offense did not violate Petitioner's rights under the United States Constitution; in Ground Five that the decision of the Ohio Court of Appeals and the Supreme Court of Ohio in *Foster* upon which the Court of Appeals relied, constituted an objectively unreasonable application of *United States v. Booker*, 543 U.S. 220 (2005); in Ground Six that the Ohio Court of Appeals applied *Rogers v. Tennessee*, 532 U.S. 451 (2001) in an objectively unreasonable manner; and in Ground Seven that the Ohio Court of Appeals rendered an objectively unreasonable decision in refusing to extend the direct application of the Ex Post Facto Clause to a context where it is clearly should have been controlling.  *Id*.

 Since Petitioner was resentenced following *Foster*, he ultimately received a sentence that did not involve mandatory judicial factfinding.  Therefore, the issue in the instant case is whether the *Foster* case changed the "statutory maximum" for *Apprendi* purposes by severing  unconstitutional portions of its sentencing statutes and whether the Ohio courts violated Petitioner's constitutional rights by retroactively applying that severed statute to Petitioner's case.

### i.    Pertinent Law

Prior to Petitioner's sentencing, the U.S. Supreme Court decided *Apprendi* and held that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 490.  While Petitioner's case was pending on direct appeal to Ohio's Ninth

District Court of Appeals, the U.S. Supreme Court decided *Blakely* and held that the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant, and not the maximum sentence a judge may impose after finding additional facts.  *Blakely*, 542 U.S. at 303.

At the time Petitioner was convicted, the Ohio Revised Code allowed for a sentence of three to ten years for felonies of the first degree, two to eight years for felonies of the second degree, and one to five years for felonies of the third degree.  O.R.C. §§ 2929.14(A)(1), (A)(2), (A)(3).  However, the Revised Code further provided that:

> (B) Except as provided in division (C), (D)(1), (D)(2), (D)(3), or (G) of this section, in section 2907.02 of the Revised Code, or in Chapter 2925. of the Revised Code, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless one or more of the following applies:
>
> > (1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
> >
> > (2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.

O.R.C. § 2929.14(B) (West 2004).  On February 27, 2006, the Supreme Court of Ohio consolidated four criminal cases in an opinion styled *State v. Foster* and held, *inter alia*, that R.C. § 2929.14(B) was unconstitutional because it "require[d] judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant." *Foster*, 845 N.E.2d at 495.  The Supreme Court of Ohio went on to remedy the error by severing the unconstitutional mandatory judicial factfinding provisions:

> [R]eferences to mandatory judicial fact-finding properly may be eliminated in the four areas of concern. Without the mandatory judicial fact-finding, there is nothing to suggest a "presumptive term." To explain Ohio's "statutory maximum" for purposes of Apprendi and its progeny, the maximum prison term authorized by the jury verdict or the facts admitted by a defendant upon acceptance of a plea is the top of the sentencing range for the crime of which the defendant is convicted. For example, if the offender is convicted of a first-degree felony, the "statutory maximum" is ten years

under R.C. 2929.14(A)(1).

*Id*. at 497.

### ii.     Application of *Foster* to Petitioner's case

In Petitioner's case there are two potential sentencing errors: (1) whether the trial judge on remand from the Supreme Court of Ohio could impose a sentence of eight years for each first and second degree felony conviction and one year for the third degree felony conviction; and (2) whether the trial judge on remand from the Supreme Court of Ohio could impose consecutive sentences for Petitioner's convictions of Attempted Murder, the merged offense of Rape and Kidnapping, Felonious Assault, and Intimidation of Crime Victim or Witness.  Petitioner contends that he should have only been sentenced to seven years for the felonious assault convictions, but acknowledges that the court could have sentenced him to nine years for the merged Attempted Murder and Rape convictions.  ECF Dkt. #9 at 9.  Petitioner offers no explanation for this conclusion.  The undersigned surmises that Petitioner has concluded that prior to *Foster*, the statutory maximum for *Apprendi* purposes was nine  years for felonies of the first degree, seven years for felonies of the second degree, and four years for felonies of the third degree because R.C. § 2929.14(C) would only permit the imposition of Ohio's statutory maximum (ten years, eight years, and five years, respectively) if the trial court made specific findings of fact.  *See* R.C. § 2929.14(C); *Foster*, 845 N.E.2d at 490; *see also* ECF Dkt. # 1 at 35 ("this Court should issue a writ of habeas corpus directing the State of Ohio either to resentence him to a nine year term of incarceration, or to provide him with a jury proceeding in which the State will be required to prove the sentencing enhancements at issue beyond a reasonable doubt.").  This analysis explains why Petitioner believes he should have been sentenced to seven years for the Felonious Assault convictions.  However, this analysis misinterprets Ohio sentencing law at the time because R.C. § 2929.14(B), which required judicial factfinding to impose more than the statutory minimum, was also unconstitutional.  For the purposes of analyzing the instant case, it is crucial to understand the difference between the available sentence that a judge could impose for a given crime at the time of Petitioner's conviction ("Ohio Statutory Maximum") and the statutory maximum for *Apprendi* purposes ("*Apprendi* Statutory Maximum") because they

-32-

were not the same prior to *Foster*.

> **iii.** **Statutory Maximums in Ohio.**

Again, the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant, and not the maximum sentence a judge may impose after finding additional facts. *Blakely*, 542 U.S. at 303. It is not simply the maximum sentence that a sentencing statute authorizes. Prior to *Foster*, the Ohio Statutory Maximum was ten years for a felony of the first degree, but that sentence could only be imposed if the trial judge made findings of fact pursuant to R.C. § 2929.14(C). Further, R.C. § 2929.14(B) imposed a presumptive minimum sentence that required judicial factfinding to be overridden. The Supreme Court of Ohio acknowledged this result in *Foster*:

> **Under R.C. 2929.14(B), therefore, a court is not authorized to exceed the shortest prison term unless it makes the additional findings.** *State v. Edmonson* (1999), 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (findings required, reasons not); *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473 (findings required for first offender). Since a jury verdict alone does not determine the sentence, R.C. 2929.14(B) violates *Blakely* principles. . . Because R.C. 2929.14(B) and (C) and 2929.19(B)(2) require judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant, they are unconstitutional.

*Foster*, 845 N.E.2d at 490, 494 (emphasis added). Therefore, due to the presumptive minimum in place by R.C. § 2929.14(B), the *Apprendi* Statutory Maximum was actually the Ohio Statutory *Minimum* sentence.

The alleged sentencing disparity for the eight-year first degree felony sentence that the trial judge imposed in this case following *Foster* is actually five years because the *Apprendi* Statutory Maximum before *Foster* was three years. The alleged sentencing disparity for the eight-year second degree felonious assault sentences that the trial judge imposed in this case following *Foster* is actually six years because the *Apprendi* Statutory Maximum before *Foster* was two years. The ultimate issue, therefore, is whether the trial court properly cured its initial sentencing error by resentencing Petitioner under the severed sentencing statutes following *Foster*.

-33-

**iv.     Due Process: Retroactive Application of Severed Sentencing Statute**

The undersigned recommends that the Court find that there was no violation pertaining to the principle felony sentences that the trial court imposed on remand (*i.e.*, the eight-year terms). Petitioner contends that the *Foster* court's retroactive application of the severed sentencing statute violates various constitutional rights.  Petitioner contends that: the remedy adopted in *Foster* was dramatically different from that utilized in *Booker*; *Foster* constitutes a retroactive elimination of a statutory element of a criminal offense; *Booker* and *Blakely* do not permit resentencing above the statutory maximum that was in effect at the time of sentencing;  and the retroactive application of *Foster* to Petitioner' case was an arbitrary and indefensible departure from existing precedent. ECF Dkt. #1.  Before determining if a violation for retroactive application of *Foster* exists, the Court should first determine if the *Foster* remedy was consistent with *Apprendi* and its progeny, particularly *Booker*.

The undersigned recommends that the Court reject Petitioner's argument because he has failed to establish that *Foster* is inconsistent with *Booker* or *Blakely* or that he was denied due process by the retroactive application of *Foster*.  Petitioner relies heavily on *Cunningham v. California*, 549 U.S. 270 (2007), in support of his argument.  In *Cunningham*, a defendant was convicted of continuous sexual abuse of a child and sentenced under California's determinate sentencing law ("DSL"), which provided a lower term sentence of 6 years, a middle term sentence of 12 years, or an upper term sentence of 16 years.  *Id*. at 270 (syllabus).  The DSL obliged the trial judge to sentence Cunningham to the 12-year middle term unless the judge found one or more additional "circumstances in aggravation."  *Id*.  The Supreme Court held that "our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent."  *Id*. at 293.

Petitioner contends that in *Cunningham*, "the Supreme Court provided a comprehensive list of the individual States which had enacted Sixth Amendment-compliant sentencing reforms in the

-34-

wake of *Booker*."  ECF Dkt. #1 at 32 citing *Cunningham*, 549 U.S. 270 at n. 17-18.  Petitioner further

claims:

> Neither the framework adopted by the Ohio Supreme Court in *Foster*, nor the identical
> severance remedy utilized by the Supreme Court of New Jersey in *State v. Natale* 878
> A.2d 724 (2005), were cited by the Supreme Court in Cunningham. *Id*. If *Foster* and
> *Natale* were permissible interpretations of *Booker*, the Supreme Court obviously
> would have identified them as such in *Cunningham* along with all of the other States
> that were listed in the decision. Accordingly, *Cunningham* makes clear that the *Foster*
> remedy is incompatible with controlling Sixth Amendment jurisprudence.

ECF Dkt. #1 at 12.  Petitioner's brief is misleading because the *Cunningham* case does not indicate

that the Court was endeavoring to list *every* state that had enacted Sixth-Amendment compliant

sentencing schemes.  Rather, the *Cunningham* Court stated:

> As to the adjustment of California's sentencing system in light of our decision, "[t]he
> ball ... lies in [California's] court." *Booker*, 543 U.S., at 265, 125 S.Ct. 738; *cf. supra*,
> at 868. We note that **several States** have modified their systems in the wake of
> *Apprendi* and *Blakely* to retain determinate sentencing. They have done so by calling
> upon the jury-either at trial or in a separate sentencing proceeding-to find any fact
> necessary to the imposition of an elevated sentence.FN17 As earlier noted, California
> already employs juries in this manner to determine statutory sentencing enhancements.
> *See supra*, at 863, 869. **Other States** have chosen to permit judges genuinely "to
> exercise broad discretion ... within a statutory range," FN18 which, "everyone agrees,"
> encounters no Sixth Amendment shoal. *Booker*, 543 U.S., at 233, 125 S.Ct. 738.

*Cunningham*, 549 U.S. 293-94 (emphasis added). Nowhere in the passage to which Petitioner cites

does the Court indicate that it identified *all* the states with Sixth-Amendment compliant sentencing

statutes.  The Supreme Court will exhaustively identify a pertinent rule of law in all jurisdictions

when necessary.  For example, in *Clark v. Arizona*, 548 U.S. 735 at 749, the Court analyzed the

insanity test in criminal cases and observed as follows:

> Seventeen States and the Federal Government have adopted a recognizable version of
> the *M'Naghten* test with both its cognitive incapacity and moral incapacity
> components.FN12 One State has adopted only *M'Naghten's* cognitive incapacity
> test,FN13 and 10 (including Arizona) have adopted the moral incapacity test
> alone.FN14 Fourteen jurisdictions, inspired by the Model Penal Code,FN15 have in
> place an amalgam of the volitional incapacity test and some variant of the moral
> incapacity test, satisfaction of either (generally by showing a defendant's substantial
> lack of capacity) being enough to excuse.FN16 Three States combine a full *M'Naghten*
> test with a volitional incapacity formula.FN17 and New Hampshire stands alone by
> the product-of-mental-illness test.FN18 The alternatives are multiplied further by
> variations in the prescribed insanity verdict: a significant number of these jurisdictions
> supplement the traditional "not guilty by reason of insanity" verdict with an alternative
> of "guilty but mentally ill." FN19 Finally, four States have no affirmative insanity

-35-

> defense, FN20 though one provides for a "guilty and mentally ill" verdict. FN21 These four, like a number of others that recognize an affirmative insanity defense, allow consideration of evidence of mental illness directly on the element of mens rea defining the offense.FN22.

*Clark*, 548 U.S. at 750-52 (footnotes omitted). In *Clark*, the Court pointed to cases or statutes outlining insanity defenses in various jurisdictions, accounting for all 50 states and the federal government. *See Id*. at n. 12-22. It is clear that the *Cunningham* Court did not do so because it identified only nine states: Alaska, Arizona, Indiana, Kansas, Minnesota, North Carolina, Oregon, Tennessee, and Washington. *See Cunningham*, 549 U.S. 270 at n. 17-18. If the *Cunningham* Court had endeavored to identify *every* jurisdiction with Sixth Amendment compliant sentencing statutes and was only able to identify nine states, it is difficult to believe that the Court would not make mention of a larger problem. Therefore, it is clear that the omission of Ohio from footnotes 17 and 18 does not dictate that its post-*Foster* sentencing remedies violate the Sixth Amendment. In fact, the undersigned notes that the United States Supreme Court denied certiorari when directly faced with the Ohio sentencing statutes in the *Foster* case. *Foster v. Ohio*, 549 U.S. 979 (2006). While Petitioner advances a tenuous argument that the omission of *Foster* from a footnote in *Cunningham* "makes clear that the *Foster* remedy is incompatible with controlling Sixth Amendment jurisprudence," he ignores the fact that the Supreme Court denied certiorari, when it was directly confronted with *Foster*.

The undersigned believes that, contrary to Petitioner's claim, the *Cunningham* case demonstrates that the remedy in *Foster* and the remedy in Petitioner's case were appropriate. The *Cunningham* Court stated:

> As to the adjustment of California's sentencing system in light of our decision, "[t]he ball ... lies in [California's] court." *Booker*, 543 U.S., at 265, 125 S.Ct. 738 . . .**Other States have chosen to permit judges genuinely "to exercise broad discretion ... within a statutory range," California may follow the paths taken by its sister States or otherwise alter its system, so long as the State observes Sixth Amendment limitations declared in this Court's decisions**. . . the case is remanded for further proceedings not inconsistent with this opinion.

*Cunningham*, 549 U.S. at 294 (emphasis added). The *Cunningham* Court clearly stated that on remand in that particular case, the state court could permit the judge to exercise discretion within a

broad range.  This is precisely what the *Foster* court did by severing the mandatory factfinding provisions from Ohio's sentencing statutes.

The Court can analogize *Foster* to *Cunningham* because, trial judges were mandated to impose a certain default sentence under the sentencing statutes in place in each state at the time – in *Cunningham* the middle term, and in *Foster* the Ohio Statutory Minimum.   Prior to *Cunningham*, a California trial judge under the DSL had to make factual findings pertaining to mitigation or aggravation.  The *Cunningham* Court held that the DSL violated a defendant's Sixth Amendment rights because it imposed a mandatory presumptive sentence and mandatory judicial factfinding.  *See Cunningham*, 549 U.S. at 290-91.  On remand from the United States Supreme Court, it is clear that California could resentence Mr. Cunningham to at least the middle DSL term, if not the maximum DSL term, because the *Cunningham* Court explicitly stated that the statutory maximum for *Apprendi* purposes was the middle DSL term.  If Petitioner's argument in the instant case were to be valid and a court could not retroactively modify its sentencing statute to change judicial factfinding requirements in the way the *Foster* court did, then the *Cunningham* Court would have directed California to sentence Mr. Cunningham to the lowest DSL term.  Otherwise, the *Cunningham* Court would have been endorsing a presumptive sentence (the middle DSL) that was improperly imposed. The Court, however, left California with much more discretion than that by allowing California to permit the judge to exercise discretion within a broad range.  On remand, the *Cunningham* Court clearly allowed California to remove a presumption in order to impose a sentence that had been unconstitutional due to that presumption.  In short, under the *Cunningham* Court's remand order, the California trial court could impose a sentence on remand that was initially unconstitutional.  The *Foster* severance remedy is consistent with the holding in *Cunningham* because it eliminated presumptive sentencing and mandatory judicial factfinding and because it permitted judges to exercise discretion within a broad statutory range.

The *Cunningham* case also indicates that the severance remedy adopted in *Booker* was an appropriate remedy for the *Foster* court to use because "there was no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue in

-37-

[*Blakely*]. Both systems were mandatory and impose[d] binding requirements on all sentencing judges." *Cunningham*, 549 U.S. at 285.

Petitioner contends "**the remedial holding** of *Booker* must be applied within the constraints of the Sixth Amendment, not as a substitute for them" because Justice Ginsburg stated in *Cunningham* that "*Booker's* remedy for the Federal Guidelines, in short, is not a recipe for rendering our Sixth Amendment case law toothless."  ECF Dkt. #1 at 31 (emphasis added).  However, Petitioner's reference to *Booker's* "remedial holding" is vague because the *Booker* Court held both that the unconstitutional portion of the sentencing provisions was severed *and* that the United States Court of Appeals was to review sentences for reasonableness post-*Booker*.  *See Booker*, 543 U.S. at 258-60 (as to severance), 260-64 (as to reasonableness).  In the statement upon which Petitioner relies, Justice Ginsburg was not discussing *Booker's* severance remedy; she was addressing the *Booker* Court's requirement that post-*Booker* sentences be reasonable.  *See Booker*, 543 U.S. at 264.[1] Justice Ginsburg made this statement in the context of addressing the California Supreme Court's constitutional analysis of the DSL.  *See Cunningham*, 549 U.S. at 289-93.  She determined that, although the *Booker* Court held that a reasonableness requirement stayed in place, it was not the sole determining factor of Sixth Amendment compliance.  *Id.*

The California Supreme Court had determined that the DSL was constitutional because it afforded judges a level of discretion analogous to federal judges following *Booker* and because judges were restrained by reasonableness.  *Cunningham*, 549 U.S. at 291.  Justice Ginsburg stated that the attempted comparison of the DSL to post-*Booker* was unavailing because the *Booker* Court held the Federal Sentencing Guidelines to be unconstitutional "because the Guidelines were

---

[1]

"As we have said, the Sentencing Commission remains in place, writing Guidelines, collecting information about actual district court sentencing decisions, undertaking research, and revising the Guidelines accordingly. See 28 U.S.C. § 994 (2000 ed. and Supp. IV). The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C.A. §§ 3553(a)(4), (5) (Supp.2004). But compare post, at 791 (SCALIA, J., dissenting in part) (claiming that the sentencing judge has the same discretion "he possessed before the Act was passed"). **The courts of appeals review sentencing decisions for unreasonableness.**" *Booker*, 543 U.S. at 264 (emphasis added).

-38-

mandatory and impose[d] binding requirements on all sentencing judges." *Id.* (internal quotations omitted). Likewise, Justice Ginsburg noted that "[u]nder California's system, judges are not free to exercise their discretion to select a specific sentence within a defined range." *Id.* at 292. (internal quotations omitted). She concluded that the pre-*Booker* mandatory Federal Sentencing Guidelines and California's DSL were unconstitutional for the same reasons, but went on to observe that:

> the *Black* court attempted to rescue the DSL's judicial factfinding authority by typing it simply a reasonableness constraint, equivalent to the constraint operative in the federal system post- *Booker*. . . Reasonableness, however, is not, as the *Black* court would have it, the touchstone of Sixth Amendment analysis. **The reasonableness requirement *Booker* anticipated for the federal system operates within the Sixth Amendment constraints delineated in our precedent, not as a substitute for those constraints.**

*Cunningham*, 549 U.S. at 292-93 (emphasis added). It was at this point that Justice Ginsburg stated that *Booker's* remedy for the Federal Guidelines, in short, is not a recipe for rendering our Sixth Amendment case law toothless. *Id.* A reading of *Cunningham* makes it clear that Justice Ginsburg was determining that a state cannot shield judicial factfinding from the Sixth Amendment by relying upon a reasonableness consideration. She made absolutely no mention of a severance remedy or retroactive remedies. Accordingly, the Court should reject Petitioner's contention that *Cunningham*'s "makes clear that the *Foster* remedy is incompatible with controlling Sixth Amendment jurisprudence" and dismiss Ground One with prejudice insofar as it pertains to the principle sentences that Petitioner received for his Felonious Assault, Attempted Murder, and Rape/Kidnapping (merged) convictions.

### v.  Issues of Consecutive Sentencing

Next, the Court must address the issue of consecutive sentencing. It appears that Petitioner concedes his claims pertaining to consecutive sentences because he acknowledges that following the filing of his petition, the United States Supreme Court decided *Oregon v. Ice*, 129 S.Ct. 711 ( 2009), and held that factual findings predicate for the imposition of consecutive sentences need not be proven beyond a reasonable doubt to a jury. ECF Dkt. #9 at 6. Petitioner then states "*Ice* does not foreclose **all** of Petitioner's sentencing claims. . . it is clear that the Trial Court could have

-39-

theoretically imposed a total sentence of 25 years without violating the Federal Constitution. . . " *Id*. at 6-7. (emphasis added). Again, Petitioner offers no basis for his 25-year calculation. Accordingly, it is difficult to ascertain what, if any, portion of Petitioner's consecutive sentence is at issue in the instant petition.[2]  Regardless, the *Oregon* Court makes it clear that no violation occurred in the instant case pertaining to Petitioner's consecutive sentences because the Court held that the Sixth Amendment does not inhibit States from assigning to judges, rather than to juries, finding of facts necessary to imposition of consecutive, rather than concurrent, sentences for multiple offenses. *Id*. at 714-15.

In *Oregon*, a man was convicted of sexually assaulting an 11-year old girl. *Id*. at 712 (syllabus). The defendant was convicted of first-degree burglary for entering with the intent to commit sexual abuse; first-degree sexual assault for touching the victim's vagina; and first-degree sexual assault for touching her breasts. *Id*. The pertinent Oregon statute allowed the judge to impose consecutive sentences in these circumstances: (1) when "a defendant is simultaneously sentenced for ... offenses that do not arise from the same ... course of conduct," § 137.123(2), and (2) when offenses arise from the same course of conduct, if the judge finds either "(a) [t]hat the ... offense ... was an indication of defendant's willingness to commit more than one criminal offense; or ... "(b) [t]he ... offense ... caused or created a risk of causing greater or qualitatively different ... harm to the victim," § 137.123(5). The trial judge first found that the two burglaries constituted separate incidents and imposed consecutive sentences for those crimes pursuant to Oregon Rev.Stat. §

---

[2] The undersigned surmises that Petitioner contends that the trial court could have sentenced him to 25 years because, as discussed above, Petitioner believes that the trial court could have imposed a nine year term *either* for Attempted Murder or the merged Rape and Kidnapping conviction. *See* ECF Dkt. #9 at 6:

> "Moreover, the fact that Ice would have permitted the Trial Court to impose a total sentence of 25 years by reducing Petitioner's felonious assault sentences to seven years and increasing **either his attempted murder or rape sentence to nine years is irrelevant.**" (Emphasis added).

Petitioner offers no explanation for why the trial court could only sentence him to nine years for one of the two crimes. Regardless, he also believes that he could have received a seven year term for the Felonious Assault conviction, and he does not appear to challenge the sentence for one year of imprisonment for Intimidation of Crime Victim or Witness.

137.123(2).  *Id*.  The judge found that each offense of touching the victim's vagina met Oregon

Rev.Stat. § 137.123(5)'s two criteria, and he imposed the sentences for those offenses consecutive

to the two associated burglary sentences. *Id*.  Lastly, he ordered that the sentences for touching the

victim's breasts run concurrently with the other sentences. *Id*.

> Justice Ginsburg, writing for the  majority, held:
>
> Most States continue the common-law tradition: They entrust to judges' unfettered
> discretion the decision whether sentences for discrete offenses shall be served
> consecutively or concurrently. In some States, sentences for multiple offenses are
> presumed to run consecutively, but sentencing judges may order concurrent sentences
> upon finding cause therefor. Other States, including Oregon, constrain judges'
> discretion by requiring them to find certain facts before imposing consecutive, rather
> than concurrent, sentences. It is undisputed that States may proceed on the first two
> tracks without transgressing the Sixth Amendment. The sole issue in dispute, then, is
> whether the Sixth Amendment, as construed in *Apprendi* and *Blakely*, precludes the
> mode of proceeding chosen by Oregon and several of her sister States. We hold, in
> light of historical practice and the authority of States over administration of their
> criminal justice systems, that the Sixth Amendment does not exclude Oregon's choice.

*Ice*, 129 at 714-15.  The *Ice* Court reasoned that the application of *Apprendi's* rule must honor the

"longstanding common-law practice" in which the rule is rooted and court must consider  whether

the finding of a particular fact was understood as within "the domain of the jury ... by those who

framed the Bill of Rights." *Id*. at 717.  "In undertaking this inquiry, [the Supreme Court] remain[s]

cognizant that administration of a discrete criminal justice system is among the basic sovereign

prerogatives States retain. . . The decision to impose sentences consecutively is not within the jury

function that 'extends down centuries into the common law.' Instead, specification of the regime for

administering multiple sentences has long been considered the prerogative of state legislatures." *Id*.

quoting *Apprendi*, 530 U.S. at 477.  The *Ice* Court went on to note that juries played no role in the

decision to impose sentences consecutively or concurrently, and that decision rested exclusively with

the judge.  *Id*.  The Court concluded that "In light of this history, legislative reforms regarding the

imposition of multiple sentences do not implicate the core concerns that prompted our decision in

*Apprendi*." *Id*.

Like  petitioner in *Ice*, Petitioner in this case received consecutive sentences for discrete

crimes.  Accordingly, *Ice* makes it clear that Petitioner's Sixth Amendment rights were not violated

when the trial judge imposed consecutive sentences.

> **vi.    Ex Post Facto Claims: Retroactive Application of Severed Sentencing Statute**

Lastly, Petitioner contends that Ohio's retroactive application of *Foster* violates the Ex Post Facto Clause of United States Constitution.  ECF Dkt. #1 at 39.  This Court made clear in *McGhee v. Konteh*, No. 1:07CV1408, 2008 WL 320763(N.D.Ohio Jan. 25 2008), unreported, that if a law is improperly made retroactive by a court, a Petitioner's remedy, if he has one, lies in the Due Process Clause, not the Ex Post Facto Clause.  *McGhee*, 2008 WL 320763 at *9-*11.  Petitioner relies principally on *Calder* and *Carmell* for the proposition that judicial severance of a statute violates the Ex Post Facto Clause.  *See* ECF Dkt. #1 at 40.  However, in 2001, one year after *Carmell* was decided, the United States Supreme Court decided *Rogers* and unequivocally stated that "As the text of the [Ex Post Facto] Clause makes clear, it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. . . We have observed, however, that limitations on ex post facto judicial decisionmaking are inherent in the notion of due process."  *Rogers*, 532 U.S. at 456.  In his traverse, Petitioner contends that the *Foster* court's act of severing a statute was legislative, not judicial, and therefore resulted in a retroactive application of a judicially *modified* statute rather than a retroactive application of a judicially *construed* statute.  ECF Dkt. #9 at 12-13.[3]  Again, the *Rogers* Court stated that the Ex Post Facto Clause does not apply "to the Judicial Branch of government."

The *Foster* court itself viewed its opinion as interpretation of statute and constitutional law,

---

[3]      Petitioner cites R.C. § 1.50 for this proposition, which provides in full:

> If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.

> R.C. § 1.50.  To the extent that Petitioner contends this section renders the Supreme Court's ruling a legislative act, the undersigned fails to see any basis because the § 1.50 simply states that unsevered portions are unaffected by invalidation of a severed provision of a statute.  It does not state that a court has legislative authority.

not as a legislative act:

> It may well be that in the future, the Ohio Criminal Sentencing Commission may recommend *Blakely*-compliant statutory modifications to the General Assembly that will counteract these, among other, concerns. Nevertheless, we are constrained by the principles of separation of powers and cannot rewrite the statutes.

*Foster*, 845 N.E.2d at 498.  Regardless of whether the *Foster* court was interpreting a statute or modifying it, Petitioner's claim, if he has one, appropriately lies in Due Process not the Ex Post Facto Clause because it is the court, not the legislature that created that alleged unconstitutional retroactive law.  Petitioner contends that the *Rogers* Court "emphasized the fact that the retroactive decision at issue involved '. . . not the interpretation of a statute but an act of common law judging.' " ECF Dkt. #1 at 30 quoting *Rogers*, 532 U.S. at 460-61.  Petitioner contends that severance of a statute "place[s] the defendant in exactly the same position as if an ex post facto law had been passed by the legislature: the text of the statute itself is what has changed, not merely its prevailing judicial interpretation." ECF Dkt. #1 at 30.  Petitioner therefore concludes that the *Foster* court has violated the Ex Post Facto Clause. ECF Dkt. #1 at 39.  First, Petitioner improperly focuses on the impact the *Foster* case had on him.  *Rogers* makes clear that the pertinent question for determining whether a petitioner has a valid Ex Post Facto Clause claim is which branch of government committed the alleged constitutional violation.  Here, Petitioner alleges that the judicial branch violated his constitutional rights; therefore his claim under the Ex Post Facto Clause lacks merit.

Further, in contending that a court's severance of a statute is a legislative action, Petitioner misses a key step in the *Roger* Court's analysis.  The *Rogers* Court made clear that the Ex Post Facto Clause *by its language* does not apply to the Judicial Branch.  The Court went on to determine if a due process violation had occurred.  It was only in the context of *due process analysis* that the Court outlined whether the defendant in *Rogers* had sufficient notice of the law that was applied in his case.  In the due process context the *Rogers* Court emphasized that the state court was interpreting common law.  The common law distinction to which the *Rogers* Court alluded was merely an indication that, for an ex post facto-type due process claim,  the Supreme Court might treat the retroactive application of statutory analysis differently than it would treat the retroactive application of common

law analysis.  The fact that the *Foster* court may have acted akin to the legislature does not make the Supreme Court of Ohio a legislature.  It remains true that "As the text of the [Ex Post Facto] Clause makes clear, it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government."  *Rogers*, 532 U.S. at 456.

If the Supreme Court of Ohio improperly applied a criminal law retroactively, defendants maintain a remedy in the Due Process Clause of the Fourteenth Amendment.  However, as this Court held in *McGhee* and more recently in *Torres v. Beightler*, No. 1:09 CV 191, 2009 WL 2705880 (N.D.Ohio, Aug. 27, 2009), unreported, that argument fails in a case such as this because Petitioner had ample notice that his conduct was criminal and ample notice of the potential penalties against him.  *McGhee*,  2008 WL 320763 at *10, n.1,2  ("In instances where a defendant was sentenced beyond the advisory guideline range following *Booker*, the Sixth Circuit has repeatedly rejected the argument that the retroactive application remedy of Booker violates the Due Process Clause and ex post facto-type due process concerns. *See United States v. Barton* FN1, 455 F.3d 649, 657 (2006); *United States v. Anderson* FN2, 187 Fed.App. 517, 2006 WL 1866348, 2006 Fed.App. 0455N (6th Cir. June 29, 2006)") (Footnote text omitted); *Torres*, 2009 WL 2705880 at *8:

> Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability to which the State ascribed to the act of murder.

quoting *U.S. v. Duncan*, 400 F.4d 1297, 1307-08 (11th Cir. 1977).  Petitioner contends that *Barton* does not apply to his case because the *Barton* court dealt with *Booker* sentencing issues and the remedy adopted in *Foster*  was "dramatically different from that in *Booker*."  ECF Dkt. #1 at 34.  Petitioner reasons that the Federal Sentencing Guidelines remained in place as advisory following *Booker*, but Federal District Courts did not have unlimited authority to impose any sentence available for any reason or for no reason at all.  *Id*.  Petitioner contends that *Foster* was different because afterwards, trial judges were "not only free to impose any sentence they wanted, but that  they would not even have to explain their reasons for choosing a particular sentence in a given case."  *Id*.

-44-

Petitioner's argument lacks merit because the *Foster* court explicitly stated that trial judges remained bound by statutory ranges (*i.e.*, they could not impose any sentence they wanted): "we have concluded that trial courts have full discretion to impose a prison sentence within the statutory range. . ." *Foster*, 845 N.E. 2d at 498.

## VI.    CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.

DATE: September 16, 2009                        *s/ George J. Limbert*

                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).